# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan Humphrey Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5014 | **DATE** | 3/17/2004 |
| **CASE TITLE** | Ocean Atlantic Development vs. Willow Tree Farm, L.L.C., DRH | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum Opinion and Order. For the reasons stated, Ocean Atlantic's motion for partial summary judgment is denied (#116) while defendants' motion for summary judgment is granted (#120). The clerk is instructed to enter judgment in favor of the defendants. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | number of notices | | |
| | Notices mailed by judge's staff. | MAR 1 8 2004 | | |
| | Notified counsel by telephone. | date docketed | | 149 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | date mailed notice | | |
| TP | courtroom deputy's initials | | mailing deputy initials | |

Date/time received in central Clerk's Office

|   |   |   |
|---|---|---|
| OCEAN ATLANTIC DEVELOPMENT CORPORATION, a Virginia Corporation, | ) ) ) |   |
|   | ) |   |
| Plaintiff, | ) |   |
|   | ) |   |
| vs. | ) ) | No. 01 C 5014 |
|   |   | Judge Joan H. Lefkow |
| WILLOW TREE FARM, L.L.C., DRH CAMBRIDGE HOMES, INC., a California Corporation, ELDA ARNHOLD, and BYZANTIO, L.L.C., | ) ) ) ) ) |   |
|   | ) |   |
| Defendants. | ) ) |   |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ocean Atlantic Development Corporation ("Ocean Atlantic"), has filed a three-count first amended complaint against defendants, Willow Tree Farm, L.L.C. ("Willow Tree"), DRH Cambridge Homes, Inc. ("DRH Cambridge"), Elda Arnhold ("Arnhold") and Byzantio, L.L.C. ("Byzantio"). In Count I, Ocean Atlantic seeks specific performance of a contract it entered with Willow Tree. In Count II, Ocean Atlantic, in the alternative, seeks damages for breach of contract against Willow Tree. In Count III, Ocean Atlantic alleges that DRH Cambridge, Arnhold and Byzantio tortiously interfered with the contract between Ocean Atlantic and Willow Tree. Ocean Atlantic is a Virginia corporation with its principal place of business in Alexandria, Virginia. Willow Tree is an Illinois limited liability company with its members being citizens of either Illinois or Florida. DRH Cambridge is a California corporation with its principal place of business in Libertyville, Illinois. Arnhold is a citizen of Illinois. Byzantio is

149

an Illinois limited liability company with all of its members being citizens of the State of Illinois. The amount in controversy exceeds $75,000 exclusive of interests and costs. Thus, this court's jurisdiction is invoked under 28 U.S.C. § 1332(a)(1) (diversity). Before the court are the parties' cross-motions for summary judgment. For the reasons stated below, Ocean Atlantic's motion is denied while defendants' motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that

2

each party would bear on an issue at trial. *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## FACTS[1]

Before addressing the facts in this case, the court pauses to note the egregious violations of the local rules this case presents. Rather than admit or deny the facts in their statements of fact, the parties instead chose to quarrel over whether certain facts were more important in light of other facts. That is improper in the statement of material facts. Moreover, there is a disturbing amount of inadmissible evidence (pointed out by no one) littered throughout each of the parties' statements, with the most prevalent problem being hearsay. The court contemplated striking both motions for summary judgment because of the above noted failures but ultimately spared the parties themselves, who would have then been forced to foot the bill for their lawyers' rather remarkable disregard for the local rules. Regrettably, this court has borne the unnecessary labor entailed, at the expense of other litigants whose matters were necessarily deferred.

This case centers around a contract between Ocean Atlantic and Willow Tree under which Ocean Atlantic was granted an easement on the Willow Tree farm (hereinafter the "Easement Agreement").[2] But the relationship of all the parties goes far beyond this contract and must be examined with some level of detail to fully understand this action. For purposes of this opinion the court assumes familiarity with two previous decisions rendered in a separate case

---

[1]The facts as set forth herein, taken from the parties' statements of material facts and supporting materials, are undisputed unless otherwise indicated.

[2]The Easement Agreement was actually two separate agreements, the Easement Acquisition Agreement and the Pipeline Easement Agreement, which also included five exhibits. (Def. L.R. 56.1 ¶ 11.) The court will refer to them both as the "Easement Agreement."

filed in this court between many of these same parties. *See Arnhold* v. *Ocean Atlantic Woodland Corp.*, 132 F. Supp. 2d 662 (N.D. Ill. 2001) *aff'd* 284 F.3d 693 (7th Cir. 2002).

Arnhold and Byzantio are former owners of farmland located in Plainfield, Illinois. (Def. L.R. 56.1 ¶¶ 6, 8.) A company called Ocean Atlantic Woodland Corp. previously had a contract to purchase the Arnhold and Byzantio farmland with an eye toward building a residential housing development. (Def. L.R. 56.1 ¶ 9.) Ocean Atlantic and Ocean Atlantic Woodland Corp. are separate legal entities but share officers and directors. (Pl. Resp. to Def. L.R. 56.1 ¶ 2; Ex. B. to Pl. L.R. 56.1 p. 18-19, 25-26.) As is detailed in the above listed action before Magistrate Judge Arlander Keys and in the Seventh Circuit's affirmance of his ruling, Ocean Atlantic Woodland Corp. failed to close on the property within the specified "drop dead" date and lost any right to purchase the farmland. (Def. L.R. 56.1 ¶ 9.)

Prior to those events, however, and during the time that Ocean Atlantic Woodland Corp. had a contract to purchase the Arnhold and Byzantio farms, Ocean Atlantic approached Willow Tree about obtaining an easement. (Def. L.R. 56.1 ¶ 10.) The Willow Tree farm adjoins both the Arnhold and Byzantio farms. (Def. L.R. 56.1 ¶¶ 6, 8.) The easement was to provide drainage for any residential development on the Arnhold and Byzantio farms through the installation of a storm pipeline and drain. (Def. L.R. 56.1 ¶¶ 12-13.)

On July 15, 1998, Willow Tree and Ocean Atlantic executed the Easement Agreement. (Pl. L.R. 56.1 ¶ 11.) The Easement Agreement provided that construction of the proposed storm drain was to be fully completed by December 31, 2000 (which was to be two years from the date of the closing on the Easement Agreement). (Def. L.R. 56.1 ¶ 15.) Under the terms of the

4

Easement Agreement, Ocean Atlantic paid $100,000 to Willow Tree in exchange for the right to construct and maintain the storm drain on Willow Tree's property.

Two portions of the Easement Agreement are particularly relevant to the parties' arguments presented here. Paragraph 9 of the Easement Agreement stated:

> 9. BOND OR LETTER OF CREDIT: As security to Grantor and to assure Grantee's timely and proper performance of its obligations under the Agreement, Grantee shall, before commencing any tests, studies, or construction and before having access to the Easement Property, obtain at its sole expense a $50,000.00 performance bond or written letter of credit issued by an insurance company or reputable financial institution acceptable to Grantor. Said bo[nd] or letter of credit shall be issued to and for the sole benefit of Grantor and shall be independent of any bond or letter of credit given to the Village of Plainfield, Illinois, or any other governmental authority.

(Def. L.R. 56.1 ¶ 16.) Exhibit "E" to the Easement Agreement also provides in part:

> Prior to any construction upon the right-of-way, [Ocean Atlantic] shall prepare or cause its engineer to prepare complete drawings, plans, and specifications of the proposed Pipeline to be installed on the easement. Said drawings, plans and specifications shall be submitted to [Willow Tree] for review by [Willow Tree] and [Willow Tree's] engineer. No construction shall commence unless and until [Willow Tree's] engineer has approved [Ocean Atlantic's] drawings, plans and specifications as the same may be modified and amended from time to time in accordance with the advice and direction of [Willow Tree's] engineer . . . .

(Pl. L.R. 56.1 ¶ 16.)

In addition to the two paragraphs noted above, other portions of the Easement Agreement provide some further background to this action. For example, paragraph 10 entitled "EASEMENT NON-EXCLUSIVE" states, "It is agreed and understood that the Easement to be granted to Grantee shall be non-exclusive . . . ." (Def. L.R. 56.1 ¶ 41.) Also, Section 1 of the related Pipeline Easement Agreement states that Willow Tree is granting "for the benefit of

Ocean Atlantic Property [defined as the Arnhold and Byzantio properties], a non-exclusive, perpetual easement . . . ." (Def. L.R. 56.1 ¶ 42.) Finally, Section 6(a)(1) of the Easement Agreement provided that the "Grantor will not encumber the Easement Property in any manner which precludes or unreasonably limits the performance of this Agreement and will obtain the written consent of its current lender, if any, on the easement document." (Pl. Add'l Facts ¶ 51.)

Apparently the first deadline that appeared in the Easement Agreement was October 12, 1998. Until that point, Ocean Atlantic was allowed access to the Willow Tree farm and was to prepare plans, specifications and descriptions of all tests and studies to be performed on the Willow Tree Farm. (Def. L.R. 56.1 ¶ 47.) These plans, specifications and descriptions of tests were to be submitted to Willow Tree by the October 12 deadline in the Easement Agreement. (*Id.*) Based on the record before the court, however, any such drafts of engineering plans and drawings were not forwarded to Willow Tree until October 3, 2000. (Def. L.R. 56.1 ¶ 48.)[3] At that time, Ocean Atlantic's engineer, Roake and Associates, Inc. ("Roake Inc."), sent a transmittal letter including what Roake Inc. referred to as "two (2) copies of the final engineering plans and specifications for the portion of the storm sewer to be constructed on the [Willow Tree farm] pursuant to the easement agreements." (Pl. L.R. 56.1 ¶ 18.) On October 13, 2000, Ocean Atlantic advised Willow Tree that the plans for the storm drain had been reviewed by the Village of Plainfield's engineers, the Department of Public Works and the Illinois Department of Transportation ("IDOT"). (Pl. L.R. 56.1 ¶ 21.) By October 18, 2000, Willow Tree approached Larson Engineering of Illinois ("Larson") to begin the process of reviewing Ocean Atlantic's

---

[3]Ocean Atlantic submits that Willow Tree agreed to waive any 1998 deadlines when it agreed to an extension of the Easement Agreement, a matter discussed below.

plans for the storm drain in accordance with the Easement Agreement. (Pl. L.R. 56.1 ¶ 21.)

Willow Tree provided Robert Schmude ("Schmude"), the Larson engineer overseeing the review,

with a set of plans that Roake Inc. had submitted to Willow Tree. (Pl. L.R. 56.1 ¶ 23.) On

October 27, 2000, Schmude requested that Roake provide him with a full set of plans that had

been provided to Will County. (Def. L.R. 56.1 ¶ 25.) On October 31, 2000, Roake Inc. provided

Schmude with the full set that had been provided to Will County. (Def. L.R. 56.1 ¶ 26.)

Willow Tree never did approve these plans per the Easement Agreement, although the

parties disputes whether these particular plans were the final plans that required approval.

Stephen Roake ("Roake") testified that these Ocean Atlantic plans submitted in the fall of 2000

were final and complete. (Pl. L.R. 56.1 ¶ 27.) In response to this point, Willow Tree points to

the testimony of Schmude (it is unclear why they say this testimony is from Roake) in which

Schmude stated that any plans which had not received final governmental approval are not

"final" and are still subject to change. (Pl. Ex. J, Schmude dep. at 27-28.)[4] John Rowley, one of

the members of Willow Tree, testified that as far as he knew the plans were "complete" as of this

time. (Pl. Ex. C, Rowley dep. at 214-15.) Rowley did state, however, that he did not consider

_____

[4] Schmude further testified in his deposition:

Q. Would you agree with me, sir, that it would make sense when you're working for Willow Tree
Farm to only do your review after you had gotten final approval of the plans from the village or
governmental authority that was appropriate?
A. It would make the most sense to do that, yes.
Q. Because if you did it before final approval you might have to start over again if the
governmental authorities changed those plans, wouldn't you?
A. Yes.
Q. And that would be inefficient, wouldn't it?
A. Yes.
Q. Could also be costly to Willow Tree Farm to have to do that review process twice, wouldn't it?
A. Yes.

(Pl. Ex J., Schmude dep. at 30-31.)

those plans to be "final" as they still needed to be approved "by all the government bodies that had jurisdiction over this." (Pl. Ex. C, Rowley dep. at 90.) Finally, there is testimony from an engineer at Larson that by November 2, 2000, Roake Inc. had submitted a "complete set of its final engineering drawings, plans and specifications to [Larson]." (Pl. Ex. O. Koltunuik Aff. ¶ 7.) Nevertheless the Larson engineer did state that "the engineering plans had not been approved for construction permit at the time they were received by [Larson]." (Pl. Ex. O, Koltunuik Aff. ¶ 15.)

In December 2000, as the December 31, 2000 deadline for construction of the easement approached, and for reasons disputed by the parties, construction of the storm pipeline and drain had not yet even started. (Def. L.R. 56.1 ¶ 49.) Accordingly, Ocean Atlantic and Willow Tree entered into an extension of the deadline (the "Extension Agreement") under which Ocean Atlantic was given until June 30, 2001 to complete construction of the storm pipeline and drain. (Def. L.R. 56.1 ¶ 15.) Willow Tree was paid $50,000 for this six-month extension. (Def. L.R. 56.1 ¶ 50.)

Concerning the performance bond or letter of credit that Ocean Atlantic was to issue to Willow Tree, it is undisputed that Ocean Atlantic did not issue the $50,000 performance bond or letter of credit before June 30, 2001, the date on which the Easement was to have been completed. (Def. L.R. 56.1 ¶¶ 26, 38.) This is despite some evidence in the record that Willow Tree notified Ocean Atlantic of the requirement of the bond or letter of credit. For example, on May 21, 2001, Willow Tree, through counsel, advised Ocean Atlantic's counsel that any entry made on the Willow Tree property would be in violation of the Easement Agreement. (Def. Ex. G.) The letter stated that "[t]he [Easement] Agreement was carefully drafted and negotiated to

insure that this type of premature entry would be avoided. Among other things, the Agreement [requires] a bond or letter of credit in the amount of $50,000, acceptable to my client, before your client has any right of access to the easement property." (*Id.*)[5] In response to the May 21 letter, Ocean Atlantic, through counsel, sent a letter dated June 7, 2001 representing that "[o]ur client will provide the $50,000 bond required under the Agreement." (Def. Ex. H.) On June 13, 2001, Ocean Atlantic's attorney acknowledged that Willow Tree had once again demanded compliance with the bond or letter of credit requirement and stated that "[w]ith respect to the performance bond, Ocean Atlantic shall comply with this requirement pursuant to the terms of the agreement." (Def. Ex. I.)

Moreover, there is evidence in the record of Ocean Atlantic's making efforts to obtain the letter of credit in June 2001, shortly before the date the easement was to have been completed. For example, Thomas E. Thomas of Yorkville Bank testified that his bank drafted a correspondence (which is not in evidence) and further sent Ocean Atlantic necessary documents on June 26, 2001 for a letter of credit to be issued. (Def. L.R. 56.1 ¶ 34.) These documents needed to be executed and returned to Yorkville Bank before any letter of credit could be issued. (*Id.*) Nevertheless, although the record as developed by the parties is less than clear, it appears that Yorkville Bank did not receive the necessary documents to process a letter of credit until June 29, 2001. (Def. L.R. 56.1 ¶ 31; Pl. Resp. to Def. L.R. 56.1 ¶ 31.) When (or if) any letter of credit was in fact issued is also not clear, but as noted above, if a bond or letter of credit was issued it was never provided to Willow Tree at any time. (Def. L.R. 56.1 ¶ 38.)

---

[5]Ocean Atlantic states that this letter was in response to a request for it to enter the property for inspection and not construction purposes, and that Willow Tree had previously allowed entry to the property for purposes of inspection. (Pl. Resp. to Def. L.R. 56.1 ¶ 20.)

There is considerable factual debate between the parties as to whether any governmental permits were (or would have been) required for this project. The governmental agencies that could have apparently been involved included Will County, the Village of Plainfield, and IDOT.[6] This much is undisputed: no permits were ever issued for Ocean Atlantic's construction of the easement on the Willow Tree farm. (Def. L.R. 56.1 ¶¶ 95-96, 106.) The parties dispute whether permits were in fact required to be obtained.[7]

Defendants rely on snippets of testimony from a variety of witnesses. Dan Hyman, an engineer at Cemcon, Ltd., testified that permits are not always required but are necessary "a good deal of the time." (Def. Ex. 6, Hyman dep. at 153.) Charles Byrum, a real estate attorney, testified that "most of the time when there is a major public improvement, some permit from somebody is obtained." (Def. Ex. 10, Byrum dep. at 334-35.)[8] The expert testimony of Roake was that "I don't believe that I've ever installed a thousand feet of 60-inch pipe on one person's property without ever coming in contact with an area that a government agency would have jurisdiction over either." (Def. Ex. 13, Roake dep. at 93.) David Peregrin, an engineer at Falcon Consulting, also testified that "[i]n my experience, I believe that there would be permits required to build the construction of improvements." (Def. Ex. 5, Peregrin dep. at 104.)

---

[6]Will County's jurisdiction was at least initially invoked because the farm land is located within the county limits. (Def. Ex. M. ¶ 3.) The Village of Plainfield could have requested permits because the Village has a right to object to any development plan occurring within 1 ½ miles of its corporate limits. (Def. Ex. 15, Burghard dep. at 8-9, 182-84.) IDOT could have required a number of permits to be issued, including a construction permit if any construction was done in or affecting a State of Illinois right-of-way, a construction permit when a proposed storm sewer was to be connected to a sewer system already in the State of Illinois' right-of-way and a permit to transport any heavy construction equipment, including bulldozers, scrapers, backhoes, cranes or loaders. (Def. L.R. 56.1 ¶¶ 107-08, 120.)

[7]The parties do not dispute that if any permits were required, Ocean Atlantic had the duty to obtain them.

[8]Ocean Atlantic submits that this project was not a "major public improvement" but provides no citation to the record to support this.

This testimony is further supported by an affidavit from Jim Song, a civil engineer with Will County, who testified that "Will County requires a site development permit to be issued for all construction, below and above ground, done in unincorporated Will County prior to commencing such construction. Specifically, Will County required such permits in all of 2001."[9] (Def. Ex. M ¶ 3.) Finally, concerning IDOT, Roake testified to his belief that the project would have to be on the IDOT right-of-way to some extent to install all the pipe. (Def. Ex. 13, Roake dep. at 97.)[10]

Ocean Atlantic takes the view that it was never required to obtain any permit for its construction. Unfortunately, much of this evidence is inadmissible.[11] The only evidence that Ocean Atlantic cites that even arguably relates to this issue is the deposition testimony of Howard J. Hamilton, an expert on behalf of Ocean Atlantic. Hamilton testified that he had concerns that a special use permit from Will County may be required and that the County was the responsible jurisdiction for permitting the construction of the pipe. (Pl. Supplemental Ex. 2, Hamilton dep. at 166-170.) Concerning any permits required by IDOT, Ocean Atlantic submits that no IDOT permits were required, but the only factual support it provides is deposition

---

[9]Rowley testified that on previous construction work on the Willow Tree Farm, Will County required permits for (1) the construction of the Rowley home; (2) additions to the home; (3) re-roofing the home; (4) surfacing the driveway; and (5) building a family gazebo. (Def. L.R. 56.1 ¶ 97.)

[10]When DRH Cambridge actually built the storm sewer in 2001, they obtained a site development permit from Will County in addition to getting their plans approved by the Village of Plainfield and IDOT.

[11]For example, Ocean Atlantic's statement of material fact ¶ 40 states, "In approximately February 2001, Tami Donahue of Will County informed Larson that Will County was relinquishing permitting authority over the Willow Tree storm drain pipe." This testimony is presented to the court through the deposition of Schmude, and Schmude testifying to what Donahue told him is, most obviously, hearsay. Moreover, Ocean Atlantic points to the deposition of Schmude wherein he stated that Donahue "told me that upon her review and her supervisor's review Will County land use department was relinquishing authority and they weren't going to require any kind of permit for the off-site sewer, off-site storm sewer." (Pl. Ex. J., Schmude dep. at 41.) Once again, this statement is clearly hearsay.

testimony by Roake that IDOT "had no authority over any of the work that was to occur except within their right of way," (Pl. Ex. N, Roake dep. at 92-93.), and deposition testimony by Hamilton in which, at best, he suggests a hypothetical where no IDOT permit would be required, but that is prefaced with the statement "my problem with responding [to the hypothetical] is I'm having a hard time imagining a realistic situation where that wouldn't happen." (Pl. Ex. GG, Hamilton dep. at 262-64.)[12] Ocean Atlantic has failed to demonstrate with any admissible evidence that permits were not needed for construction of the storm pipeline and drain.

On May 18, 2001, Ocean Atlantic contacted Willow Tree to request an inspection of the farm in preparation of construction. (Def. L.R. 56.1 ¶ 52.) Ocean Atlantic submits that this would have given them sufficient time to construct the pipeline and restore the land because their engineer testified that the project would take "between twenty and twenty-five working days, start to finish including restoration." (Pl. Ex. N., Roake dep. at 108; *but see*, Def. Ex. 6, Hyman dep. at 87, estimating that the project would take "[f]our to five weeks.") In May of 2001, Ocean Atlantic contacted Falcon Consulting ("Falcon"), an engineering firm, regarding the possibility of managing or constructing the storm pipeline and drain. (Def. L.R. 56.1 ¶ 53.) Peregrin, an engineer with Falcon, testified that he was aware that the construction of the storm drain and the restoration of the land had to be completed by June 30, 2001. (Def. L.R. 56.1 ¶ 54.) Falcon began looking for subcontractors to construct the storm pipeline and drain on "about May 24th or [2]5th" or the "middle to the end of May . . . ." (Def. Ex. 5, Peregrin dep. at 50-51.) However,

---

[12]Significantly, during this testimony Hamilton was discussing whether overweight and access permits were required. With regard to a construction permit, Hamilton further testified that construction of the pipe would require an IDOT permit because "if they didn't have an IDOT permit, they wouldn't have the right to extend the pipe or, indeed, to even extend their construction area into the state right-of-way, which would mean just physical impossibility, they couldn't extend the pipe without an overlap area between the two." (Def. Resp. to Pl. Add'l Facts ¶10.)

no subcontractors were hired either by Ocean Atlantic or Falcon at any time to complete the project. (Def. L.R. 56.1 ¶ 71.)

The storm drain on the Willow Tree farm was to be constructed with pipe that was 5-6 feet in diameter. (Def. L.R. 56.1 ¶ 56.) The type of pipe for the project needed to be specially ordered and built. (Def. L.R. 56.1 ¶ 57.) Moreover, the project also required special manhole structures. (*Id*.) None of the required special items for the project were ordered in May or June 2001. Needless to say, because construction of the pipeline never started it was not completed by the June 30, 2001 deadline contained in the Extension Agreement. On July 6, 2001, Willow Tree filed with the Will County Recorder of Deeds a Termination of Easement Grant. (Def. L.R. 56.1 ¶ 79.)

On or about April 12, 2001, DRH Cambridge entered into a contract to purchase the Byzantio and Arnhold properties. (Pl. L.R. 56.1 ¶ 67.) Thereafter, on June 13, 2001, DRH Cambridge, Byzantio and Arnhold executed the First Amendment to Real Estate Sales Contract. (Pl. L.R. 56.1 ¶ 114.) The First Amendment to Real Estate Sales Contract provides in part that DRH Cambridge's obligation to purchase the Arnhold and Byzantio farm was conditioned upon "[DRH Cambridge] and Willow Tree Farm, LLC agreeing to terms for the grant of an offsite stormsewer [sic] easement on terms mutually acceptable to [DRH Cambridge] and Willow Tree Farm." (Pl. L.R. 56.1 ¶ 115.) On July 19, 2001, Willow Tree agreed to grant to Byzantio and Arnhold an easement across the same parcel of property it had previously granted to Ocean Atlantic. (Pl. L.R. 56.1 ¶ 125.) Byzantio and Arnhold conveyed the easement rights they obtained from Willow Tree to DRH Cambridge as part of the closing on DRH Cambridge's purchase of the Byzantio and Arnhold farms. (Pl. L.R. 56.1 ¶ 126.)

## DISCUSSION

### A.  Specific Performance/Breach of Contract (Counts I and II)

Willow Tree believes that summary judgment is appropriate in its favor on the count I and II claims because (1) Ocean Atlantic never provided the $150,000 bond or letter of credit according to the terms of the Easement Agreement; (2) Willow Tree was justified in demanding that proper permits be obtained for the construction of the easement; therefore, it would be against public policy to enforce the Easement Agreement since no public permits were obtained; and (3) Ocean Atlantic could not have performed under the Easement Agreement because it did not obtain the necessary government permits, it could not have completed the project by the stated deadline, and it did not secure any of the necessary materials for construction. Ocean Atlantic, on the other hand, submits that partial summary judgment should be granted in its favor for the simple reason that Willow Tree breached the Easement Agreement by not reviewing the plans submitted to them, and this failure to review the plans excused any further performance by Ocean Atlantic, including the letter of credit or performance bond obligation or any requirement that government permits be obtained.

First, as to Ocean Atlantic's position on its motion, the argument is based on the premise that Willow Tree's review and approval of the plans was a condition precedent to any of Ocean Atlantic's obligations to perform under the Easement Agreement. In Ocean Atlantic's view, because Willow Tree never reviewed and/or approved any of the plans submitted,[13] Ocean

---

[13]Interestingly, there is evidence in the record showing that Ocean Atlantic believed exactly the opposite in June 2001. Ocean Atlantic's counsel sent to Willow Tree a letter stating in part,

With respect to your client's approval of the plans and specifications of the storm sewer, such approval has been achieved. In October 2000, Ocean Atlantic and its engineer, Roake &

(continued...)

Atlantic never had any obligation to perform under the Easement Agreement and never was required to submit the $50,000 performance bond or letter of credit. For purposes of this argument, the court shall assume that Willow Tree did not review the plans and as a result breached the Easement Agreement.

Under Illinois law, a condition precedent is defined "as one which must be performed either before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform." *MXL, Indus, Inc.* v. *Mulder*, 252 Ill. App. 3d 18, 26, 623 N.E. 2d 369, 375 (1993); *Lyntel Prods., Inc.* v. *Alcan Aluminum Corp.*, 107 Ill. App. 3d 176, 180, 437 N.E. 2d 653, 656 (1982). If one party fails to perform a condition precedent, the obligations of the parties are at an end. *Lyntel Prods., Inc.*, 107 Ill. App. 3d at 180, 437 N.E. 2d at 657. Both parties to a contract must agree to a condition precedent before it becomes binding. *Hardin, Rodriguez & Bovin Anesthesiologists, Ltd.* v. *Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992); *Wasserman* v. *Autohaus on Edens, Inc.*, 202 Ill. App. 3d 229, 235-36, 559 N.E. 2d 911, 916 (1990). Moreover, Illinois courts disfavor conditions precedent and contracts will not be construed as having conditions precedent unless required to do so by plain, unambiguous language. *See, e.g.*, *Liu* v. *T & H Mach., Inc.*, 191 F.3d 790, 798 (7th Cir. 1999) (noting that Illinois follows Williston's classic rule that "[w]here it is doubtful whether

---

[13](...continued)

Associates, Inc., provided final engineering to your client and its engineer, Larson Engineering, for their approval. As you pointed out in our conversation yesterday, neither your client nor its engineer reported any concerns or objections to the final engineering nor were any suggested modifications submitted to Ocean Atlantic or Roake & Associates. The chronology on this issue has been captured in various correspondence, copies of which I have attached hereto for your review.

(Def. Ex. I.)

words create a promise or an express condition, they are interpreted as creating a promise" and further noting that "[a] condition precedent must be stated expressly and unambiguously.") (citing *LaGrange Federal Savings and Loan Ass'n v. Rock River Corp.*, 97 Ill. App. 3d 712, 717, 423 N.E. 2d 496, 501 (1981)); *Boulevard Bank Nat. Assoc. v. Philips Medical Systems Int'l B.V.*, 811 F. Supp. 357, 365 (N.D. Ill. 1993); *A.A. Conte v. Campbell-Lowrie-Lautermilch*, 132 Ill. App. 3d 325, 329, 477 N.E. 2d 30, 33 (1985).

Ocean Atlantic first argues that a "plain reading" of the Easement Agreement illustrates a sequence of events that favors its view that approval of the plans was a condition precedent to Ocean Atlantic's duty to perform its obligations under the Easement Agreement. According to Ocean Atlantic, it was first obligated to pay Willow Tree $100,000 as part of the Easement Agreement and then an additional $50,000 as part of the Extension Agreement. After satisfying these obligations, Ocean Atlantic states that it was only required to submit complete engineering plans to Willow Tree for its review and approval. Ocean Atlantic argues that only after the plans had been approved would the issue of construction of the Easement Agreement arise. Moreover, with regard to the $50,000 bond or letter of credit, Ocean Atlantic maintains that the bond was only required after the plans were approved because the bond was required prior to "construction," although, in fact, the Easement Agreement states that the bond is required before "commencing any tests, studies, or construction and before having access to the Easement property . . . ." (Pl. Ex. D ¶ 9.)[14]

---

[14]The parties fail to make this point clear, but as best the court can tell, Ocean Atlantic was allowed access to the Willow Tree farm to "prepare plans, specifications and descriptions of all tests and studies to be performed on the Willow Tree farm" until October 12, 1998. (Def. L.R. 56.1 ¶ 47.) After that time period, it appears that Willow Tree could have no access to the farm until the bond or letter of credit was issued.

The contract does not expressly and unambiguously state that Ocean Atlantic's obligations under the Easement Agreement are not to be performed until the plans are approved by Willow Tree, nor does the Easement Agreement make clear that such an arrangement was agreed to by both Ocean Atlantic and Willow Tree. In addition, at least with respect to the bond or letter of credit that Ocean Atlantic was obligated to provide to Willow Tree, it has broader application than to only the "construction" of the easement. As is set forth in the Easement Agreement, the bond or letter of credit was expressly required prior to any "tests, studies, or construction and before having access to the Easement property . . . ." Construing the Easement Agreement to provide that the bond or letter of credit was contingent on approval of the plans for construction is problematic, particularly when the requirements of the bond or letter of credit would apply even before construction. Indeed, there is evidence in the record that Ocean Atlantic sought to enter the land prior to approval of the plans but before construction and before a letter of credit was issued for "inspection" purposes. (Def. L.R. 56.1 ¶ 52.) Willow Tree denied this request because the bond or letter of credit had never been submitted. (Def. Ex. G.) Even construing the facts in Ocean Atlantic's favor, the inescapable conclusion here is that both parties breached the Easement Agreement. Willow Tree did not approve the plans and Ocean Atlantic never provided a bond or letter of credit. Neither of these obligations depended on one another nor can be fairly said to have caused the other party's breach. Because neither side performed its obligations under the contract, no action for breach of contract can be advanced. *See, e.g., Fireman's Fund Mortgage Corp.* v. *Zollicoffer*, 719 F. Supp. 650, 657 (N.D. Ill. 1989) ("Thus, a party who has materially breached a contract cannot recover under the contract."); *Goldstein* v.

17

*Lustig*, 154 Ill. App. 3d 595, 599, 507 N.E. 2d 164, 168 (1987) ("In order for a party to recover on a contract, he must have performed his part of it.").

Ocean Atlantic, however, takes the view that this was an option contract, and that it was required to provide a bond only if it exercised this option and, even then, only "immediately before it began construction." This argument fails for a number of reasons. First, as it does throughout its brief, Ocean Atlantic ignores that the bond was not simply required prior to "construction" of the pipeline and drain but also prior to any "tests, studies, or construction and before having access to the Easement property . . . ." Second, even if the Easement Agreement were construed as being an option contract, Ocean Atlantic cannot in good faith argue that they did not exercise the option to build the storm pipeline and drain. The record shows that Ocean Atlantic submitted plans for Willow Tree's approval (Def. L.R. 56.1 ¶ 48), spoke with Willow Tree about the bond requirement (Def. Ex. H), attempted to in fact obtain the bond (Def. L.R. 56.1 ¶ 34-37), hired a general contractor for the project (Def. L.R. 56.1 ¶ 53), and contacted Willow Tree for inspection of the land prior to construction. (Def. L.R. 56.1 ¶ 52.) Indeed, Ocean Atlantic admitted in other portions of its brief that it exercised the option to build the pipeline and drain, and the court holds it to that admission. *See* Resp. to Def.'s Mot. For Summ. J. at 18 ("Second, if [Ocean Atlantic] sought to exercise its option to install the storm drain (which it did) . . . ."). All of this provides ample evidence to show that if this was an option contract, Ocean Atlantic exercised its option to build the drain and pipeline. Ocean Atlantic would apparently mean to suggest that it never did exercise any option unless it either completed the pipeline or it actually began construction. But its actions noted above belie that argument.

In light of the conclusion that Willow Tree's fulfillment of its obligation to review plans was not a condition precedent to Ocean Atlantic's duty to provide security, and even assuming that Willow Tree breached a material term of the contract by failing to approve plans, this case boils down to the fact that both parties breached and, therefore, neither can recover against the other. Because Ocean Atlantic did not perform its obligations under the Easement Agreement, it cannot pursue its action for breach of contract against Willow Tree. Accordingly, Willow Tree's motion for summary judgment on Counts I and II will be granted.

## B.    Tortious Interference (Count III)

Under Illinois law, the elements of a tortious interference with contract claim are "(1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach." *Wheel Masters Inc.* v. *Jiffy Metal Prods. Co.*, 955 F.2d 1126, 1129 (7th Cir. 1992); *George A. Fuller Co.* v. *Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1330 (7th Cir. 1983).

Defendants argue that because Ocean Atlantic has no actionable breach of contract claim, its action for tortious interference with contract must also fail. They cite *Francorp* v. *Siebert*, No. 00 C 1248, 2000 WL 1741918, at *3 (N.D. Ill. Nov. 24, 2000), although absolutely nothing in that case supports defendants' theory. Nevertheless, the court is persuaded that insofar as Ocean Atlantic, in addition to Willow Tree, breached the Easement Agreement, Ocean Atlantic is unable to establish element (5) of the above test. There can be no damages resulting from Willow Tree's breach of the Easement Agreement because Ocean Atlantic itself also was in

breach. Accordingly, defendants' motion for summary judgment on this Count III claim will also be granted.

## CONCLUSION

For the reasons stated above, Ocean Atlantic's motion for partial summary judgment is denied [#116] while defendants' motion for summary judgment is granted [#120]. The clerk is instructed to enter judgment in favor of the defendants. This case is terminated.

ENTER: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: March 17, 2004

20